No. 15-30324

# In the United States Court of Appeals for the Fifth Circuit

SEAHAWK LIQUIDATING TRUST,
as Trustee of Seahawk Drilling, Incorporated

*Plaintiff-Appellant,*

v.

CERTAIN UNDERWRITERS AT LLOYDS LONDON; ACE EUROPEAN GROUP LIMITED; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA; AXIS SPECIALTY EUROPE, LIMITED; LANCASHIRE INSURANCE COMPANY, LIMITED; SWISS RE INTERNATIONAL SE; ASPEN INSURANCE U. K. LIMITED; BERKLEY INSURANCE COMPANY; ARCH INSURANCE COMPANY; INTERNATIONAL INSURANCE COMPANY OF HANNOVER, LIMITED; HUDSON SPECIALTY INSURANCE COMPANY; NAVIGATORS INSURANCE COMPANY; NEW YORK MARINE & GENERAL INSURANCE COMPANY; TORUS INSURANCE

*Defendants-Appellees.*

On Appeal from the Judgment of the
United State District Court for the Middle District of Louisiana
Civil Action No. 3:12-cv-81
The Honorable James T. Trimble, Jr., Presiding

## REPLY BRIEF OF PLAINTIFF-APPELLANT SEAHAWK LIQUIDATING TRUST

JAMES M. GARNER, T.A. (#19589)
PETER L. HILBERT, JR. (#6875)
KEVIN M. MCGLONE (#28145)
**SHER GARNER CAHILL RICHTER KLEIN & HILBERT, L.L.C.**
909 Poydras Street, Suite 2800
New Orleans, Louisiana 70112-4046
Telephone: (504) 299-2100
Facsimile: (504) 299-2300
E-Mail: jgarner@shergarner.com
philbert@shergarner.com
kmcglone@shergarner.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

INTRODUCTION ......................................................................................... 1

I.     Underwriters fail to establish that the "proximate cause"
       analysis is the appropriate standard to determine the number
       of occurrences in a property damage case ...................................... 3

II.    When determining the number of occurrences, the phrase
       "arising out of the same occurrence" must be given
       a broad interpretation ..................................................................... 9

III.   Even if a "proximate cause" analysis were appropriate –
       which is denied – the result would still show that there was
       only a single occurrence ................................................................. 12

IV.    Provisions in the policy regarding the number of occurrences
       in certain weather conditions do not compel a conclusion that
       there were multiple occurrences in this case in the absence of
       policy language to that effect ......................................................... 19

V.     Underwriters fail to show that the District Court properly
       dismissed Seahawk's loss of contract claim .................................. 19

CONCLUSION ........................................................................................... 21

CERTIFICATE OF SERVICE ................................................................... 23

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ......................... 24

# TABLE OF AUTHORITIES

## CASE LAW

*California Ins. Guar. Ass'n v. Liemsakul*,
    193 Cal App. 3d 433 (Cal. App. 1987) ............................................................... 20

*Federal Insurance Co. v. Bock*,
    382 S.W.2d 305 (Tex. Ct. Civ. App. 1964) ................................................. 12, 13

*Gilbert Texas Constr., L.P. v. Underwriters at Lloyd's London*,
    327 S.W.3d 118 (Tex. 2010) ......................................................................... 9

*Goose Creek Consolidated I.S.D. v. Continental Casualty Co.*,
    658 S.W.2d 338 (Tex. Ct. App. 1983) ................................. 4, 5, 6, 8, 10

*H.E. Butt Grocery Co. v. National Union Fire Insurance Co. of Pittsburgh, PA*,
    150 F.3d 526 (5th Cir. 1998) ........................................... 6, 7, 8, 9, 10

*Lee v. Interstate Fire & Cas. Co.*,
    86 F.3d 101 (7th Cir. 1996) .......................................................... 10

*Lone Star Industries, Inc. v. Mays Towing Co.*,
    927 F.2d 1453 (8th Cir. 1991) ................................................ 14, 15, 18

*Nunley v. M/V DAUNTLESS COLOCOTRONIS*,
    727 F.2d 455 (5th Cir. 1984) (en banc) ................................ 16, 17, 18

*Stolt Achievement Ltd. v. Dredge B.E. LINDHOLM*,
    447 F.3d 360 (5th Cir. 2006) ..................................................... 18

*U.E. Texas One-Barrington, Ltd. v. General Star Indemnity Co.*,
    332 F.3d 274 (5th Cir. 2003) .......................................... 4, 5, 8, 10, 11

# **INTRODUCTION**

Plaintiff-Appellant Seahawk Liquidating Trust, as Trustee of Seahawk Drilling, Inc. ("Seahawk") respectfully submits this Reply Brief.  At trial, Seahawk conclusively established the following undisputed facts:

- Underwriters issued to Seahawk an all risks insurance policy with a liner negligence clause and loss of contract endorsement;

- The J/U SEAHAWK 3000 encountered severe weather on several occasions in February 2010 culminating on February 28, 2010;

- As a result of those encounters with severe weather in February 28, 2010, the J/U SEAHAWK 300 sustained significant damages to the jacking system, and its legs became misaligned;

- The legs of the J/U SEAHAWK 3000 were still misaligned on July 21, 2010;

- As a result of the misalignment of the legs, the J/U SEAHAWK 3000 was unable to jack safely out of the water on July 21, 2010 and sustained further damage when severe weather moved through the area where the rig was attempting to jack up; and

- As a result of the incidents of February 2010 and July 21, 2010, the J/U SEAHAWK 3000 underwent more than $16 million in repairs.

Notwithstanding these undisputed facts, the District Court rendered judgment in favor of Underwriters. Underwriters attempt to demonstrate the correctness of the District Court's decision, but their efforts fall short of the mark. They do not establish that the "proximate cause" analysis employed by the District Court was the proper test for establishing the number of occurrences when numerous decisions of this Court instruct that the proper inquiry is the event giving rise to the insurer's liability. Underwriters even fail to discuss the pertinent and factually analogous cases addressing the number of occurrences and, instead rely on a case interpreting a general liability policy to determine the number of cases involving an employee's sexual molestation of children.

Moreover, even if the District Court employed a proper proximate cause analysis, which is denied, the conclusions of that analysis were clearly erroneous. Underwriters rely on wholly inapplicable cases to support their contention and never attempt to argue that the case cited by the District Court in support of its conclusion was correct. The undisputed facts offered at trial established that the misalignment of the legs of the J/U SEAHAWK 3000 occurred in February 2010 and, further, said misalignment was a cause of the damage to the rig on July 21, 2010. The undisputed evidence shows there was a single occurrence, and the District Court's contrary ruling should be reversed.

Furthermore, Underwriters have not established that the concurrent cause doctrine applies to exclude Seahawk's claim under the Loss of Contract Endorsement. Nothing in the text of the policy requires application of the concurrent cause doctrine. Underwriters ignore the plain text of the endorsement requiring only that a claim be recoverable, not payable. Further, Underwriters fail to establish the correctness of the District Court's conclusion that the misaligned legs did not play a factor in the loss of the Hilcorp drilling contract as its conclusion ignored substantial and uncontroverted evidence to the contrary. For these reasons, discussed in more detail below, the District Court's Judgment should be reversed and the case remanded.

**I.    Underwriters fail to establish that the "proximate cause" analysis is the appropriate standard to determine the number of occurrences in a property damage case.**

Underwriters spend much of their brief arguing that a proximate cause standard is appropriate to apply in this case, but they fail to cite this Court to a single case in which this Court applied such a test of occurrences in a dispute over the number of occurrences in a first-party property damage case.

In fact, Underwriters abandon any reliance on the two first-party property damage cases on which they had relied in briefing to the District Court and try to compare the present case to a decision of this Court determining the number of occurrences in a liability policy. Underwriters' brief offers only minimal

discussion of one of the cases most applicable to the present appeal, *U.E. Texas One-Barrington, Ltd. v. General Star Indemnity Co.*, 332 F.3d 274 (5th Cir. 2003), and Underwriters fail to discuss of even cite to *Goose Creek Consolidated I.S.D. v. Continental Casualty Co.*, 658 S.W.2d 338 (Tex. Ct. App. 1983), another factually similar case addressing the number of occurrences in the context of property damage.  The omission of any significant discussion of these cases is telling.  Underwriters' failure to discuss these cases must be seen as a concession that the holdings in these cases support Seahawk's position.  *See* Seahawk's Original Brief at p. 24-28 (discussing *U.E. Texas One-Barrington* and *Goose Creek* and their application to Seahawk's claim).

Both cases focus on the general rule that "the proper focus in interpreting 'occurrence' is on the ***events that give rise to the [insurer's] liability***, rather than on the number of injurious effects."  *U.E. Texas One-Barrington*, 332 F.3d at 277 (emphasis added).  Further, the court should not look to any "overarching cause, but rather to focus on the ***event that gave rise to the [insurer's] liability***, rather than on the number of injurious effects."  *Id.* at 278 (citing *Goose Creek*, *supra*) (emphasis added).

Underwriters briefly discuss *U.E. Texas One-Barrington* and complain that Seahawk's argument for a "but for" causal relationship between two events for determining the number of occurrences is at odds with the holding in that case.

*See* Underwriters Brief at 30. Such argument ignores the facts of that case and this Court's holding in *U.E. Texas One-Barrington*. The insured's claim in *U.E. Texas One-Barrington* failed because he conceded that the installation of the pipes was not a cause of the loss to individual buildings in the apartment complex. In other words, each leak at the apartment complex was separate and distinct from any other loss. Even a "but for" causation standard would not have saved the insured's case in *U.E. Texas One-Barrington* when there was *no* causal link between the installation of the plumbing system and its failure.

In contrast, as discussed in Seahawk's Original Brief, the event giving rise to Underwriters' liability was the bad weather encountered by the J/U SEAHAWK 3000 in February 2010 and the resulting misalignment of the rig's legs. Seahawk offered uncontroverted testimony at trial that the damage sustained on July 21, 2010 was not separate and apart from the events of February 2010, but, rather, was linked by the misalignment of the legs in February 2010 and the J/U SEAHAWK 3000's having to jack out of level on July 21, 2010. *See, e.g.,* ROA.3970:2-3971:8 & ROA.3974:9-22. Under the guidance of *Goose Creek* and *U.E. Texas One-Barrington*, the event giving rise to the Underwriters' liability in this case is the misalignment of the legs of the J/U SEAHAWK 3000 in February 2010 that impacted the ability of the rig to jack out of the water on July 21, 2010 leading to further damage. But for the events of February 2010, the events of July 21, 2010

do not happen.  Therefore, application of the proper legal standard to Seahawk's claim establishes that there was only one occurrence, and the District Court's judgment must be reversed.

Ignoring the most analogous cases, Underwriters instead focus their argument on this Court's decision in *H.E. Butt Grocery Co. v. National Union Fire Insurance Co. of Pittsburgh, PA*, 150 F.3d 526 (5th Cir. 1998), a case interpreting a liability insurance policy with facts far different than those before this Court in this appeal.  In *H.E. Butt*, a store employee sexually assaulted two different children on separate days at the same store.  *Id.* at 528.  After the store reached a settlement with each child, the store sought a ruling that two incidents constituted a single occurrence so it would only have to pay one $1 million self-insured retention in settlement of the case.  *Id.*  The District Court held there were two occurrences, and the store appealed.

This Court, guided by *Goose Creek*, articulated the appropriate inquiry for determining the number of occurrences as whether "the events that cause the injuries and give rise to the insured's liability, rather than on the number of injurious effects." *Id.* at 530.  This Court concluded under that framework that the event giving rise to injury was not the negligent hiring or supervision of the employee; rather, the event giving rise to damage was the abuse itself. *Id.* at 531.  The Court concluded that "when the underlying basis for liability is negligent

supervision, yet the damage is caused by an intervening intentional tort, the court cannot look past the immediate cause of the damage for purposes of the insurance policy." *Id.*

Thus, the *H.E. Butt* Court never engages in a search for the "proximate cause" of the insured's liability. Underwriters cite to only a single paragraph of this Court's opinion in *H.E. Butt* discussing the concept of uninterrupted and continuing causes, but this Court never held that the molestation was the "proximate cause" of the insured's liability, resulting in a finding of two occurrences.

Indeed, in two separate parts of the opinion, this Court confirmed that the ultimate inquiry in determining the number of occurrences was to focus on the event giving rise to liability  In a footnote early in the opinion, Judge Garza responded to Judge Benavides' concurrence by noting that the appropriate inquiry in determining the number of occurrences is a cause test focusing on the event giving rise to liability – something Judge Garzas described as "related aspects of the same test or principle." *Id.* at 530 n.2. Second, in its concluding statement, this Court observed that it determined there were multiple occurrences "not by looking to the number of injuries or the number of victims, but rather by ***looking to the two independent events that gave rise to HEB's liability and caused the injuries.***" *Id.* at 535 (emphasis added).

Additionally, this Court had in *U.E. Texas One-Barrington*, *supra*, confirmed such a holding when it quoted *H.E. Butt* for the proposition that the appropriate question under Texas law is "'on the events that cause the injuries and give rise to the insured's liability, rather than on the number of injurious effects.'" *U.E. Texas One-Barrington*, 332 F.3d at 277 (quoting *H.E. Butt* and *Ran-Nan Inc.*).

Thus, the only appropriate inquiry for the District Court in the present case was to determine what event gave rise to the Underwriters' liability for damage to the J/U SEAHAWK 3000. The District Court did not engage in such review and, therefore, must be reversed. If the District Court applied the proper analysis under *Goose Creek*, *U.E. Texas One-Barrington*, or even *H.E. Butt*, it would have concluded that the ***event giving rise to Underwriters' liability was the severe weather encountered by the J/U SEAHAWK 3000 while under tow in February 2010 that resulted in significant damage to the rig, including the misalignment of it legs.***

The events of February 2010, including the misalignment of the rig's legs, put in motion the damage that occurred on July 21, 2010. There was no interruption of events, and the two events are not independent of each other. In contrast, this Court properly found two occurrences in *H.E. Butt* because the two incidents of sexual molestation were unconnected in time and place. That both

incidents involved the same employee and the same store was not sufficient to make them a single connected event. In the present case, Underwriters still do not contest that the legs of the J/U SEAHAWK 3000 became misaligned in February 2010, and they do not dispute that the misalignment of the legs was caused the rig's hull falling off its pins on July 21, 2010. Such uncontroverted evidence compels the conclusion that there was only a single occurrence; thus, the District Court's contrary conclusions should be reversed.

## II.    When determining the number of occurrences, the phrase "arising out of the same occurrence" must be given a broad interpretation.

No one disputes that the appropriate focus in determining the number of occurrences starts with the definition of "occurrence" in the policy. *See, e.g.*, *Gilbert Texas Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). The key language in the present case is whether there was a "sequence of losses or damages arising from the same occurrence." P.Exh. 1 at HAWK-00218; R.E. Tab 6. In its Original Brief, Seahawk cited numerous instances in which this Court held that the phrase "arising from" is given a broad construction. *See* Original Brief at p. 31.

Underwriters dispute this assertion and contend that the interpretation of the term "occurrences" should be neither insured nor insurer friendly. In support of that contention, Underwriters rely on the following paragraph from this Court's decision in *H.E. Butt*, *supra*:

> HEB fails to recognize that the interpretation of "occurrence" favorable to the insured in this case will not necessarily be the interpretation favorable to the insured in the next case. Because HEB serves as its own primary insurer (because of its SIR limit), it wants to call the separate molestations one "occurrence" to limit the number of self-insured retentions it must pay. The Seventh Circuit noted, however that "[w]inners and losers will change with the circumstances. . . . [I]f tomorrow the victim's loss exceeds the maximum coverage for a single occurrence, the roles will be reversed. The [insurance company] would want to call the sexual abuse a single occurrence to cap its own exposure, while the Diocese would favor multiple occurrences in order to maximize its insurance coverage.

*Id.* at 534 (quoting *Lee v. Interstate Fire & Cas. Co.*, 86 F.3d 101, 104 (7th Cir. 1996).

Seahawk agrees with this Court's rationale as applied to a ***general liability policy***. The policy before this Court in the present case, however, is a ***first-party property policy***. The above-quoted observation cannot be extrapolated to a first-party property policy where the issue is the number of occurrences. One would be hard pressed to imagine a circumstance in which an insurer would argue for two deductibles under the same property policy. In almost all conceivable cases, the insured, like Seahawk in the present case, is always going to want one occurrence and one occurrence, and the insurer, like Underwriters, will want multiple occurrences and multiple deductibles to reduce its exposure. Such was the case in the key first party property cases cited by Seahawk in the present case – *U.E. Texas One-Barrington* and *Goose Creek*.

Thus, Underwriters are wrong to suggest that the term "arising from" should not be given a broad meaning favoring Seahawk and a finding of a single occurrence.  Underwriters are further in error when they suggest that a broad meaning of the term "arising from" is contrary to the holding in *U.E. Texas One-Barrington*.  Even construing "arising from" in a broad manner does not change the result in that case. The undisputed facts in that case were that the 19 instances of plumbing failures were isolated and independent of each other.  There was no evidence before the court that there was any link between any of the 19 plumbing leaks as the parties had stipulated that a different leak damaged each building.  332 F.3d at 278.  It would be absurd to trace the leaks back to the installation of the pipes because, as the court noted, that would render any damage to the structure a single occurrence related to the installation of the plumbing.

Seahawk submits that the phrase "arising from" must be read broad enough that two events separated by time but otherwise arising out of a common case constitute a single occurrence.  At trial, Seahawk presented substantial and uncontroverted evidence at trial that the July 21, 2010 damages to the J/U SEAHAWK 3000 arose from the bad weather encountered in February 2010 and the subsequent misalignment of the legs.  Thus, giving "arising from" a broad meaning and considering the undisputed evidence at trial, there is only a single occurrence causing damage in February 2010 and July 21, 2010.

Finally, Underwriters insist that Seahawk is improperly using a "but for" test to determine causation, but it was Underwriters who argued to the District Court and even suggest to this Court that but for the jacking the J/U SEAHAWK 3000 out of the water in heavy weather on July 21, 2010 there would have been no damage to the rig. *See* Underwriters' Brief at p. 14-15. Seahawk submits that the proper inquiry should be whether the damage on July 21, 2010 would have occurred but for the legs of the J/U SEAHAWK 3000 becoming misaligned in February 2010. The uncontroverted evidence offered at trial demonstrated that the misaligned legs was a cause of the damage to the rig on July 21, 2010. Thus, there was only one occurrence.

**III. Even if a "proximate cause" analysis were appropriate – which is denied – the result would still show that there was only a single occurrence.**

Underwriters also attempt to defend the District Court's conclusion that the events of July 21, 2010 were an intervening and superseding cause of damage to the J/U SEAHAWK 3000 that constituted a second occurrence, yet Underwriters do not even cite or discuss the case on which the District Court relied for its conclusion that there were two occurrences. Not once to Underwriters argue that the District Court properly relied on *Federal Insurance Co. v. Bock*, 382 S.W.2d 305 (Tex. Ct. Civ. App. 1964), presumably because Underwriters agree with

Seahawk that the *Bock* court's analysis militates in favor of finding a single occurrence, not two occurrences.

In its brief, Seahawk demonstrated that application of the *Bock* court's analysis – even assuming it to be the proper analysis in this case – supports a finding that the cause of damage to the J/U SEAHAWK 3000 on July 21, 2010 was causally related to the events of February 2010 when the rig encountered severe weather, culminating in the misalignment of the rig's legs. *See* Seahawk's Original Brief at p. 35-36. Just as the *Bock* court concluded that the hurricane set in motion the chain of events leading up to the loss of power and spoliation of the insured's inventory, so the unrefuted evidence at trial established a causal link between the legs in February 2010 and the accident of July 2010.

Instead, Underwriters focus only on the same facts relied on by the District Court for its erroneous conclusion that there were two occurrences. First, Underwriters seize on the fact that the J/U SEAHWK 3000 was able to complete *a single drilling contract* at East Cameron Block 275 before the rig sustained additional damage on July 21, 2010. While the J/U SEAHAWK 3000 was able to complete its drilling contract on July 3-4, 2010, it did so *only* after the crew made the decision to jack the port leg ahead of the bow leg to minimize the legs' rubbing against the jack house and alleviate pressure on the yoke guide to mitigate the effects of the misaligned legs. *See* ROA.3756:6-22 & 3934:23-3935:1. It was this

same unorthodox jacking method that the J/U SEAHAWK 3000 was engaged in on July 21, 2010 when it sustained additional damage. The performance of a single drilling contract by itself does not permit the inference that the J/U SEAHAWK 3000 was perfectly repaired and operating at full capacity and that the events of July 21, 2010 are independent of the events of February 2010.

Underwriters also argue that the damage sustained on July 21, 2010 was not inevitable because the J/U SEAHAWK 300 has continued operations since that time without the legs having been repaired. Underwriters question why there would have been no other incidents. This argument ignores the fact that the J/U SEAHAWK 3000 currently operates after more than $16 million in repairs were made to the rig to allow it to continue operating. The post-repair operating condition of the rig should have no effect on whether an accident was inevitable given the condition of the damaged J/U SEAHAWK 3000 on July 21, 2010.

Underwriters further attempt to analogize this case to the facts before the Eight Circuit Court of Appeals in *Lone Star Industries, Inc. v. Mays Towing Co.*, 927 F.2d 1453 (8th Cir. 1991). In *Lone Star*, Mays, a towing company, negligently damaged a barge while it was in tow to the barge owner's facility resulting in a crack in the stern of the barge above the water line. Lone Star, the barge's owner, attempted to complete an inspection of the barge but skipped inspection of the stern compartment because of accumulated ice on the stern. Unloading of the

barge began at the bow and continued to the stern.  Normally, this would cause the stern to go under the water.  When the stern went below the water, water entered through the crack, and the barge sank.

On appeal, the issue was whether Lone Star's negligent failure to inspect the barge before commencing loading operations was a superseding cause of Mays' negligent damaging of the barge.  The Eighth Circuit found that it was because "[a]bsent Lone Star's negligence in failing to inspect prior to unloading, the barge could have sat at the dock indefinitely and would not have sunk." *Id.* at 1460.  The court further concluded that "Lone Star's negligence in failing to inspect was an affirmative act unrelated to any negligence of Mays towing." *Id.*  In other words, "that Lone Star might unload the barge without inspection was not within the scope of risks attributable to Mays Towing under the circumstances." *Id.*

Underwriters insist that the same rationale applies in this case because Seahawk allegedly tried to jack the rig out of the water with full knowledge that it was doing so in conditions inappropriate for jacking operations.  Underwriters suggest that Seahawk could not have anticipated that the rig would be damaged with a longer jacking procedure.  This argument makes no sense.  Seahawk was owner and operator of the rig.  It certainly understood the risk that the misaligned legs posed to the rig, especially the fact that the unorthodox jacking method

employed by the rig would take longer for the rig to jack out of the water exposing the rig to danger if weather conditions deteriorated.

Seahawk submits that the more appropriate comparison is to this Court's en banc decision in *Nunley v. M/V DAUNTLESS COLOCOTRONIS*, 727 F.2d 455 (5th Cir. 1984) (en banc). In *Nunley*, a barge being pushed down the river was sunk due to the negligence of certain "upriver defendants." *Id.* at 457. The owner of the barge never marked the wreck. *Id.* Three years after the barge sank, the M/V DAUNTLESS struck the unmarked wreck triggering numerous lawsuits against various parties including the "upriver defendants." *Id.* The trial court granted judgment on the pleadings to the upriver defendants and held that the superseding cause of the wreck involving the M/V DAUNTLESS was the failure of the sunken vessel owner or the United States to mark the first wreck in violation of the federal statute absolving the upriver defendants of any negligence. *Id.* at 457-58.

On appeal, this Court, sitting en banc, reversed the trial court's conclusions. While recognizing that other parties were negligent for failing to mark the wreck, this Court refused to hold that said negligence operated to absolve the upriver defendants from any liability for their negligence in causing the wreck. *Id.* at 463-64. The court found that the upriver defendants should have anticipated that the

sunken vessel would remain unmarked as a result of the negligence of others.  *Id.*

at 464.  Quoting from a treatise on tort law, this Court stated:

> "The risk created by the defendant may include the intervention of the foreseeable negligence of others.  As we have seen above, the ***standard of reasonable conduct may require the defendant to protect the plaintiff against 'that occasional negligence which is one of the ordinary incidents of human life***, and therefore to be anticipated."

*Id.* (quoting Prosser, Law of Torts, 4th ed. 274) (internal citations omitted) (emphasis added).

Applying this Court's holding in *Nunley* to the present case, it was foreseeable that Seahawk may begin jacking the rig out of the water in conditions that were only slightly outside the boundaries of its operating manual.  It is important to note that Underwriters have **never** argued – and the District Court **never** held – that Seahawk's jacking the J/U SEAHAWK 3000 out of the water on July 21, 2010 was grossly negligent.  At best, Seahawk was **merely** negligent.[1]  In *Nunley*, the parties whose conduct was determined not to be a superseding intervening cause were alleged to have violated a federal statute on marking wrecks.  If a violation of a statute cannot constitute a superseding and intervening cause, then surely the mere negligence of a party cannot so constitute a superseding and intervening cause.  Moreover, Seahawk's alleged negligence was

---

[1] It should also be noted that Underwriters have never argued – and the District Court never found – that mere negligence could exclude coverage for the events of July 21, 2010.

foreseeable in this case just as it was foreseeable to the upriver defendants that a wreck they caused would remain unmarked for three years due to the negligence of parties wholly outside their control so as to render the upriver defendants liable for a future collision with the sunken vessel. Accordingly, Underwriters' reliance on the Eighth Circuit's decision in *Lone Star Industries* is wholly misplaced.

Finally, Underwriters cite this Court's decision in *Stolt Achievement Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360 (5th Cir. 2006) for the proposition that superseding cause is rejected only where the negligent acts occur within a very small window. As the facts of *Nunley*, *supra*, demonstrate, however, that is not always the case as this Court determined that negligent acts spanning three years did not serve to cut off the initial negligent act. In this case, there was a lapse of about 5 months between the events of February 2010 and the incident of July 21, 2010.

In summary, Seahawk presented undisputed evidence at trial showing that the events of February 2010 and July 21, 2010 were part of one continuous uninterrupted event. Underwriters' liability was triggered with the events of February 2010, when, among other damage, the legs became misaligned. Between February 2010 and July 21, 201, there was no intervening extraordinary or unforeseeable act of negligence that would sever the causal chain set in motion in February 2010 when the legs of the J/U SEAHAWK 3000 became misaligned.

The District Court failed to cite the appropriate standard for determining whether there was a superseding and intervening cause and his conclusions were legally and factually in error.  Accordingly, the Judgment in favor of Underwriters should be reversed.

**IV.  Provisions in the policy regarding the number of occurrences in certain weather conditions do not compel a conclusion that there were multiple occurrences in this case in the absence of policy language to that effect.**

Underwriters further contend that the policy itself provides that incidents of heavy weather separated in time should be treated separately.  The District Court ignored this argument and for good reason.  While the policy states that damage due to heavy weather during one operating period is one occurrence or that damage during any one 72 hours is a single occurrence, the policy does not state that the converse is also true.  In other words, nothing in the policy provides that damages due to heavy weather but not occurring during one operating period or damages in heavy weather more than 72 hours apart are separate occurrences.  If Underwriters intended for such a provision to exist, it could have written such provision in the policy, but they did not.

**V.  Underwriters fail to show that the District Court properly dismissed Seahawk's loss of contract claim.**

Turning to Seahawk's claim for recovery under the Loss of Contract Endorsement, Underwriters completely fail to rebut Seahawk's argument that the concurrent cause doctrine is inapplicable to Seahawk's recovery.  Seahawk is

entitled to recover under the Loss of Contract Endorsement if it shows that a covered loss (the misaligned legs) presents a recoverable claim under the insurance policy. Seahawk is then entitled to recover the amount of the lost contract minus any revenue received from a replacement drilling rig.

Nothing in the text of the Loss of Contract Endorsement requires Seahawk to allocate covered from excluded damages or show what percentage of a contract was lost as a result of covered damages. Seahawk's claim under the Loss of Contract Endorsement is not for actual repair costs that are susceptible to allocation. It is for an amount certain for the loss of the contract.

Underwriters ignore all of this. It treats the Loss of Contract Endorsement just like recovery of physical repair damages, but the two are not the same. Underwriters ignore the difference between a "claim payable" that might require application of the concurrent cause doctrine and a "claim recoverable" which is an amount that is recoverable under insurance even though it may not be actually paid. *See* Seahawk's Original Brief at p. 43-45 & *California Ins. Guar. Ass'n v. Liemsakul*, 193 Cal App. 3d 433 (Cal. App. 1987).

Underwriters also fail to demonstrate that the District Court was not clearly erroneous in its conclusion that the misalignment of the legs was not a cause of Seahawk's loss of the Hilcorp drilling contract. First, there was no evidence at trial that the failure of the J/U SEAHAWK 3000 to jack out of the water at the

Hilcorp drilling location was due solely to failures of the hydraulic drilling system of the rig. On the contrary, the evidence was undisputed that the misalignment of the legs was a partial cause of the failure of the J/U SEAHAWK 3000 to jack on location in April 2010.

It is illogical to conclude that the repairs to the hydraulic system after loss of the Hilcorp contract and operation of the J/U SEAHAWK 3000 without repairing the misaligned legs indicates that the misaligned legs played no part in the failure to jack up at the Hilcorp Drilling location. Underwriters offered no evidence at trial that the sole cause of the rig's inability to jack up was the condition of the hydraulic system. In contrast, Seahawk offered uncontroverted expert testimony that not only was the condition of the hydraulic system not the sole cause of the loss of the contract but also that the misalignment of the legs was a cause of the loss of contract. ROA.4112:5-16. The District Court's contrary conclusion was clearly erroneous and should be reversed.

## CONCLUSION

In conclusion, Underwriters have failed to show that the District Court's Judgment was legally and factually correct. The District Court erred in its legal and factual conclusions regarding the number of occurrences that befell the J/U SEAHAWK 3000 and the reasons for the loss of the Hilcorp drilling contract.

Accordingly, Seahawk respectfully requests that this Court reverse the District Court's Judgment in favor of Underwriters and remand for further proceedings.

RESPECTFULLY SUBMITTED

  /s/  *James M. Garner*
JAMES M. GARNER, T.A. (#19589)
PETER L. HILBERT, JR. (#6875)
KEVIN M. MCGLONE (#28145)
**SHER GARNER CAHILL RICHTER
  KLEIN & HILBERT, L.L.C.**
909 Poydras Street, Suite 2800
New Orleans, Louisiana  70112-4046
Telephone:  (504) 299-2100
Facsimile:   (504) 299-2300
E-Mail:      jgarner@shergarner.com
             philbert@shergarner.com
             kmcglone@shergarner.com

**ATTORNEYS FOR
PLAINTIFF-APPELLANT,
SEAHAWK LIQUIDATING TRUST**

## **<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that pursuant to FED. R. APP. P. 25 and 5TH CIR. R. 25, the above and foregoing Appellate Reply Brief was electronically filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the CM/ECF system, and that a copy has been served upon counsel for all parties to this proceeding as identified below through the court's electronic filing system as follows:

> Harold K. Watson, Esq.
> CHAFFE MCCALL, L.L.P.
> 801 Travis Street
> Suite 1910
> Telephone:   (713) 343-2952
> E-Mail:       watson@chaffe.com
> *Counsel for Defendants/Appellees*

On this, the   6th   day of August, 2015.


  /s/ James *M. Garner*
JAMES M. GARNER

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I HEREBY CERTIFY that this brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains 5,126 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, Professional Plus 2013, in 14 point Times New Roman font.

Dated:  August 6, 2015

    /s/  *James M. Garner*
JAMES M. GARNER